UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VANESSA SHEROD, AS ADMINISTRATOR OF THE ESTATE OF ELIZABETH WILES, AND IN HER OWN RIGHT,<br><br>          Plaintiff,<br><br>     v.<br><br>COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC d/b/a BRIGHTON REHABILITATION AND WELLNESS CENTER, COMPREHENSIVE MANAGEMENT SERVICES – PROPERTY, LLC, CHMS GROUP, LLC, SAMUEL HARPER, EPHRAM LAHASKY, HEALTHCARE SERVICES GROUP, INC., HCSG LABOR SUPPLY, LLC, HCSG SUPPLY, INC., HCSG STAFF LEASING SOLUTIONS, LLC, QUALITY BUSINESS SOLUTIONS, INC., AND BRIAN EDWARD MEJIA,<br><br>          Defendants. | Case No: 2:20-cv-1198<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION**<br><br>Electronically Filed |

## NOTICE OF REMOVAL

Please take notice that Defendant, Comprehensive Healthcare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness Center ("Defendant Brighton"), hereby removes this case from the Court of Common Pleas of Allegheny County to the United State District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1331, § 1441, § 1442, §1446, the

Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d, 247d-6e (2005) (the "PREP Act"), and the Declaration for Public Readiness and Emergency Preparedness Act Coverage for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198-01 (March 17, 2020) and further states:

1. On July 1, 2020, Plaintiff initiated this action by filing a complaint in the Court of Common Pleas of Allegheny County in a matter styled <u>Vanessa Sherod, as Administrator of the Estate of Elizabeth Wiles, and in her own right v. Comprehensive Healthcare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness Center, Comprehensive Management Services – Property, LLC, CHMS Group, LLC, Samuel Harper, Ephram Lahasky, Healthcare Services Group, Inc., HCSG Labor Supply, LLC, HCSG Supply, Inc., HCSG Staff Leasing Solutions, LLC, Quality Business Solutions, Inc., and Brian Edward Mejia</u>, G.D. No. 20-007319. A true and correct copy of Plaintiff's Complaint and Jury Demand is attached hereto as Exhibit A.

2. Defendant's removal is timely under 28 U.S.C. § 1446(b) as it is being filed within 30 days of proper service of the Complaint on Defendant Brighton on July 24, 2020.

3. In accordance with 28 U.S.C. §1446(a), a true and correct copy of all of the process and pleadings filed in the action to date, along with a copy of the Civil Docket Sheet, are collectively attached to this notice as Exhibit B (in addition to the Complaint, which is Exhibit A).

4. As required by 28 U.S.C. §1446(d), concurrent with this filing, Defendant Brighton is filing a true and correct copy of this Notice of Removal with the Clerk of the Court of Common Pleas of Allegheny County, Pennsylvania. A true and correct copy of the Notice of Filing the Notice of Removal is attached hereto as Exhibit C.

5. This Notice of Removal is being filed in the United States District for the Western District of Pennsylvania, the District Court of the United States within which the state court action is pending, as required by 28 U.S.C. §§1441(a) and 1446(a).

6. Removing counsel also represents Defendants Comprehensive Management Services – Property, LLC, CHMS Group, LLC, Sam Halper (incorrectly identified as Samuel Harper), and Ephram Lahasky. A question remains as to whether service has been properly effectuated upon any of these Defendants as of the time of this filing. However, these Defendants consent to the removal of this case to this Court. A true and correct copy of the Consent to Removal on behalf of these Defendants, which will also be filed concurrently with this Notice of Removal, is attached hereto as Exhibit D.

7. As of the time of this filing, the docket does not reflect that Defendants, Healthcare Services Group, Inc., HCSG Labor Supply, LLC, HCSG Supply, Inc., HCSG Staff Leasing Solutions, LLC, Quality Business Solutions, Inc., and Brian Edward Mejia, have been served with Plaintiff's Complaint, nor does counsel for Removing Defendant have knowledge of such service. Therefore, their consent is not required for purposes of this removal. However, upon information and belief, these Defendants will consent to this Removal, if required.

8. Accordingly, Defendant Brighton has satisfied all procedural requirements governing removal pursuant to 28 U.S.C. §§ 1441 and 1446, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

9. By filing this Notice of Removal, Defendant Brighton does not waive any defenses that may be available to it.

## **JURSIDCTION EXISTS UNDER 28 U.S.C. § 1331 (FEDERAL QUESTION)**

### **Plaintiff's Allegations and Claims in the Complaint**

10. Plaintiff alleges that Ms. Wiles, an employee of Defendant Healthcare Services Group, Inc., was exposed to and infected with COVID-19 while working at Brighton Rehabilitation and Wellness Center. See Exhibit A, at ¶ 3.

11. Plaintiff's claims against Defendant Brighton include negligence, medical negligence, fraudulent misrepresentation, intentional misrepresentation, wrongful death, and survival arising from the Brighton Defendant's response to COVID-19 pandemic and its administration and use of personal protective equipment ("PPE"), testing equipment, safety equipment and other countermeasures in an attempt to prevent or mitigate the spread of COVID-19.

12. Plaintiff alleges that Defendants failed to protect Plaintiff's Decedent, Elizabeth Wiles, from the COVID-19 virus during and throughout the pandemic by virtue of its failure to properly provide, administer, and utilize safety and testing equipment and supplies that were designated countermeasures to combat the COVID-19 outbreak, including, but not limited to, items identified as PPE, such as gloves and face masks. See, e.g., Exhibit A, at ¶¶ 77, 78, 82, 87, 88, 90 118, 122(c), 122(f), 122(t), 122(mm), 122(uu), 122(vv), 122(ww), 122(ddd).

### **Plaintiff's Claims are Preempted by the PREP Act, and Significant Federal Issues Arise Under Federal Law**

13. The PREP Act provides liability protections for pandemic and epidemic products and security countermeasures. Specifically, this legislation empowers the Secretary of Health and Human Services (HHS) to issue a written declaration and provide that a "covered person" shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an

individual of a covered countermeasure" during a health emergency. 42 U.S.C. § 247d–6d(a)(1). Here, the Secretary issued a Declaration, which became effective on February 4, 2020, to provide liability immunity for activities related to medical countermeasures against COVID-19. This declaration was amended March 17, 2020 to specifically include "respiratory protective devices." 85 FR 21012.

14. Congress has provided an exclusive federal cause of action and exclusive federal remedy for claims under the PREP Act, involving a "covered activity" relative to a "covered countermeasure". Pursuant to § 247d-6d(b)(8)(A)-(B), "no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that is different from, or is in conflict with, any requirement applicable under this section" and relates to, among other things, use or administration of the covered countermeasure. As such, Congress has deemed the PREP Act to preempt state law for purposes of federal question jurisdiction.

15. Defendant Brighton is a "Covered Person" as contemplated by 42 U.S.C. § 247d–6d. More specifically, Defendant Brighton is a "covered person" in that it is both a "qualified person" and "program planner" under 42 U.S.C.A. § 247d-6d(i)(2)(B).

16. In pertinent part, a "covered person" includes a person or entity that "is a qualified person who prescribed, administered, or dispensed" COVID-19 Countermeasures. 42 U.S.C. § 247d–6d(i)(2)(B)(iv).

17. A "qualified person" is defined as a "licensed health professional or other individual who is authorized to prescribe, administer, or dispense such countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed." Id.

18. A "program planner" is defined as "a State or local government, including an Indian tribe, a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b)." 42 U.S.C. § 247d–6d(i)(6).

19. Further, the PREP Act defines a "person" as "an individual, partnership, corporation, association, entity, or public or private corporation, including a federal, state or local government agency or department." 42 U.S.C. § 247d–6d(i)(5).

20. Defendant Brighton was acting as a "qualified person" because Defendant Brighton is a healthcare provider authorized to administer and/or use FDA approved medical devices, such as face masks, to prevent or mitigate the spread of COVID-19.

21. Defendant Brighton also was acting as a "program planner" that supervised and/or administered the infection control and COVID-19 specific programs in the treatment of COVID-19 patients, under which countermeasures, including, but not limited to, the use of face masks and other personal protective equipment, visitation restrictions, and screening requirements at the Facility while the Decedent was working there, in an effort to prevent or mitigate the spread of COVID-19.

22. In this case, Plaintiff's allegations relate to the countermeasures taken by Defendant Brighton to prevent or mitigate the spread of COVID-19.

23. Because Plaintiff has alleged claims involving a "covered activity" relative to a "covered countermeasures" – namely, Defendant Brighton's administration of countermeasures, such as the use of testing and safety equipment, face masks, gloves, and other PPE to prevent or mitigate

the spread of COVID-19, all state law claims asserted by Plaintiff in the Complaint are completely preempted by the PREP Act.

24. Moreover, because the precautions at issue concern the precise respiratory protective devices, testing equipment, and safety equipment mentioned in the PREP Act Directive issued to address COVID-19, this action presents a federal question under the PREP Act, giving this Court original jurisdiction.

25. Therefore, federal jurisdiction is further appropriate as the state action "arises under" federal law and raises a substantial federal issue, actually disputed and substantial. See Grable & Sons Metal Prods. V. Darue Eng'g & Mfg., 545 U.S. 308 (2005).

26. In retaining jurisdiction, the federal court would not disturb a balance of state and federal responsibilities. Id.

27. Accordingly, this action is properly removable under 28 U.S.C. § 1441(a) as this United States District Court has original jurisdiction of this case under 28 U.S.C. § 1331, which provides in pertinent part:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

See also Parker v. St. Lawrence County Public Health Department, 102 A.D.3d 140, 954 N.Y.S. 2d 259 (2012).

### JURSIDCTION EXISTS PURSUANT TO THE FEDERAL OFFICER REMOVAL STATUTE (28 U.S.C. § 1442(a)(1))

28. Removal is also proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer.

29. "[T]he federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum.'" In re Commonwealth's Motion to Appoint Counsel Against or

Directed to Def. Ass'n of Phila., 790 F.3d 457, 466 (3d Cir. 2015) (quoting Sun Buick, Inc. v. Saab Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994)).

30. This case is removable pursuant to Section 1442(a) because "(1) Defendant is a 'person' within the meaning of the statute; (2) Plaintiff's claims are based upon Defendant's conduct 'acting under' the United States, its agencies, or its officers; (3) the Plaintiff's claims are 'for, or relating to' an act under color of federal office; and (4) Defendant raises a colorable federal defense to the Plaintiff's claims." Papp v. Fore-Kast Sales Co., 842 F.3d 805, 811 (3d Cir. 2016). All requirements for removal under § 1442(a)(1) are satisfied here.

31. Defendant Brighton is a "person" under the federal officer removal statute. It is a corporate entity, and corporations are "person[s]" pursuant to Section 1442(a)(1). Papp, 842 F.3d at 812 (for purposes of Section 1442(a), "a corporation is in legal fact a person" (citing 1 U.S.C. § 1)).

32. The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks." Ruppel v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012)(quoting Watson v. Philip Morris Cos., Inc., 551 U.S. 142 (2007)); see also Defender Ass'n, 790 F.3d 457, 468 (2015).

33. To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" Watson, 551 U.S. at 152. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." Papp, 842 F.3d at 813.

34. A specific instruction from a federal officer, or a detailed regulation to compel specific conduct, satisfies the second requirement. See <u>Winters v. Diamond Shamrock Chem. Co.</u>, 149 F.3d. 387 (5th Cir. 1998).

35. The following are an exemplary, but are in no way a complete list, of some of the detailed directives and regulations issued by Centers for Medicare and Medicaid Services ("CMS"), the Centers for Disease Control ("CDC"), the Department of Health and Human Services (HHS), and the President of the United States to specifically compel healthcare providers and nursing homes, like Defendant Brighton, to assist in the national effort to respond to the COVID-19 pandemic.

36. As early as February 6, 2020, CMS took direct action to prepare healthcare facilities for a national response to what would be become the COVID-19 pandemic.[1]

37. Additionally, as early as February 1, 2020, the CDC was providing superseding guidance to state and local health departments and healthcare facilities including detailed recommendations for patient screening for the COVID-19 virus. In doing so, the CDC acknowledged that current knowledge of the nature of the virus was evolving, and that these efforts were part of "an ongoing US public health response to identify and contain the outbreak and prevent sustained spread of 2019-nCov in the United States."[2]

---

[1] Centers for Medicare & Medicaid Services, Press Release "CMS Prepares Nation's Healthcare Facilities for Coronavirus Threat" (February 6, 2020) (available at https://www.cms.gov/newsroom/press-releases/cms-prepares-nations-healthcare-facilities-coronavirus-threat).

[2] Centers for Disease Control and Prevention, Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).

38. On or about March 4, 2020, CMS announced several additional actions aimed at limiting the spread of the COVID-19 virus, including requiring healthcare facilities to maintain specific infection control and prevention policies as a condition for participation in CMS programs.[3]

39. Additionally, on this date, CMS called for healthcare facilities to work at the direction and coordination of the CDC and local public health departments. CMS also addressed the screening of entrants into nursing facilities. Defendant followed these directives in an effort to assist, or to help carry out, the duties or tasks of CMS and the CDC in responding to the COVID-19 pandemic.

40. On March 10, 2020, CMS published a memorandum clarifying and amending policies and guidance in light of the CDC's expansion of the types of facemasks healthcare workers may use in situations involving COVID-19.[4] In doing so, CMS acknowledged the federal government was taking "critical steps" to prepare health care facilities to respond to COVID-19, and acknowledged the need to "explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country." The memorandum issued on this date cites specifically to updates from the CDC regarding addressing the supply, allocation, and use of various items utilized to prevent the spread of infection and directly treat the virus including PPE and respirators, and further addressed the use of airborne infection isolation rooms (AIIR).

41. As previously noted, on this same date, the Secretary of HHS issued notice pursuant to section 564 of the Federal Food, Drug, and Cosmetic (FD&C) Act that there is a public health emergency that has a significant potential to affect national security or the health and security of United

---

[3] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention Concerning Coronavirus (COVID-19): FAQ's and Considerations for Patient Triage, Placement and Hospital Discharge (March 4, 2020) (available at https://www.cms.gov/files/document/qso-20-13-hospitalspdf.pdf-2).

[4] Centers for Medicare & Medicaid Services, Guidance for Use of Certain Industrial Respirators by Health Care Personnel (March 10, 2020) (available at https://www.cms.gov/files/document/qso-20-17-all.pdf).

States, and in doing so, declared justifying the authorization of emergency use of personal respiratory protective devices during the COVID-19 outbreak, pursuant to section 564 of the FD&C Act, subject to the terms of any authorization issued under that section.[5]

42.     Three days later, on March 13, 2020, CMS published <u>revised</u> directives, specifically aimed at nursing homes, to "improve infection control and prevention practice to prevent the transmission of COVID-19."[6] In updating its directives, CMS ordered facilities to restrict visitors, cancel communal activities, screen staff, amend policies regarding interaction with vendors, and handle potential end-of-life interactions with family members, among other interventions. CMS also provided guidance regarding patient transfers and accepting patients with COVID-10. Critically, a CMS memorandum on this date acknowledged scarcity of PPE such as gowns, N95 respirators, surgical masks and ABHR, and noted it would not cite facilities for lack of supplies for reasons outside of their control. Again, CMS directed infection control efforts and clarified CDC guidance to preserve scarce medical resources including PPE and maximize the capacity of the healthcare system to mitigate the spread of the pandemic.

43.     On this date, President Donald J. Trump issued a "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. Following same, rapid action was taken to waive restrictions and expand capacity for healthcare entities, providers, and suppliers to coordinate a national response to the national emergency.

44.     On April 2, 2020, CMS issued **new** guidelines aimed specifically to long-term care facilities to mitigate the spread of COVID-19, with the stated purpose of 'critical, needed leadership"

---

[5] Department of Health and Human Services, Office of the Secretary, Emergency Use Declaration, Federal Register/ Vol. 85, No. 47 (March 10, 2020) (available at https://www.govinfo.gov/content/pkg/FR-2020-03-10/pdf/2020-04823.pdf).

[6] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised) (March 13, 2020) (available at https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf).

and issuing "immediate" actions to "keep patients and residents safe."[7] Specifically, CMS directed long-term care facilities to "immediately" ensure compliance with "all CMC and CDC guidance related to infection control." Again, CMS specifically referenced and referred facilities to updated and revised CDC guidelines. CMS also implemented a number of actions to be undertaken immediately including 1) universal screening; 2) conservation of PPE; 3) proper PPE use; and 4) allocation of separate staffing, among other directives.

45. On April 19, 2020, CMS announced new regulatory requirements requiring nursing facilities to inform residents, families, and representatives of COVID-19 cases.[8]

46. On May 13, 2020, CMS announced a "new toolkit" developed to aid nursing homes with additional resources to aid in the fight against the coronavirus disease 2019 (COVID-19) pandemic within nursing homes. Per the CMS website, "The toolkit builds upon previous actions taken by the Centers for Medicare & Medicaid Services (CMS), which provide a wide range of tools and guidance to states, healthcare providers and others during the public health emergency. The toolkit is comprised of best practices from a variety of front line health care providers, Governors' COVID-19 task forces, associations and other organizations, and experts, and is intended to serve as a catalogue of resources dedicated to addressing the specific challenges facing nursing homes as they combat COVID-19."[9]

---

[7] Centers for Medicare & Medicaid Services, COVID-19 Long-Term Care Facility Guidance (April 2, 2020) (available at https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf).

[8] Centers for Medicare & Medicaid Services, Press Release "Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort" (April 19, 2020) (available at https://www.cms.gov/newsroom/press-releases/trump-administration-announces-new-nursing-homes-covid-19-transparency-effort).

[9] Centers for Medicare & Medicaid Services, Press Release "CMS Issues Nursing Homes Best Practices Toolkit to Combat COVID-19" (May 13, 2020) (available at https://www.cms.gov/newsroom/press-releases/cms-issues-nursing-homes-best-practices-toolkit-combat-covid-19).

47. At all relevant times, Defendant Brighton, in its preparation and response to the COVID-19 outbreak, was acting at the specific instruction and oversight of the federal government in responding to a federal effort to address the ongoing national state of emergency. Defendant Brighton's actions were taken "in an effort to assist, or to help carry out, the duties or tasks" dictated by the CDC and CMS in responding to the COVID-19 pandemic.

48. Defendant Brighton's actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction." See Fung v. Abex Corp., 816 F. Supp. 569, 572 (N. D. Cal. 1992).

49. Defendant Brighton was acting specifically at the direction and under the supervision of the United States government with respect to various countermeasures implemented to prevent and treat the COVID-19 virus including following evolving and specific guidelines from CMS and the CDC with respect to: 1) infection control policies and procedures; 2) PPE procurement; 3) PPE allocation; 4) admission and discharge of residents; 5) managing visitors and outside persons; 6) staffing allocation and retention; 7) isolation protocols and management, among multiple additional directives.

50. In short, Defendant Brighton's response to the COVID-19 outbreak was directly related to what they were asked to do by the federal government.

51. The next requirement, often referred to as the "nexus" or "causation" requirement, demands that the alleged conduct have been undertaken "for or relating to" a federal office. To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." Defender Ass'n, 790 F.3d at 471.

52. There is a clear causal nexus between the claims against Defendant Brighton and the actions taken by it in responding to and administering care related to the COVID-19 outbreak.

Plaintiff's Complaint specifically alleges a deficiency in Defendant Brighton's actions concerning use of PPE and infection control procedures taken in efforts to prevent the spread of COVID-19 within the nursing facilities while preserving resources to enable a nationwide response. Unquestionably, the nexus element is met as evidence by various orders, guidelines and recommendations followed by Defendant Brighton in addressing same.

53. Finally, Defendant Brighton meets the final requirement insofar as it intends to assert a colorable federal defense including, among others, that the immunity under the PREP Act applies to the present action. For the purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure that the validity of the defense may be tried in federal court. Willingham v. Morgan, 395 U.S. 402, 407 (1969).

54. As previously set forth, Defendant Brighton asserts that it is immune from liability in this matter under the PREP Act, as it meets the requirements of "covered person" as contemplated by 42 U.S.C. § 247d–6d in that it is both a "qualified person" and a "program planner." Further, Defendant Brighton's actions specifically related to these claims constitute "covered countermeasures" pursuant to the PREP Act, which would qualify and trigger immunity from liability for the purposes of the present suit.

WHEREFORE, this action is hereby removed to this Court from the Court of Common Pleas of Allegheny County, Pennsylvania. Plaintiff is hereby notified to proceed no further in state court.

Dated: August 12, 2020                                      GORDON & REES LLP

By: /s/ Andrew G. Kimball, Esq.

Andrew G. Kimball
PA I.D. No. 46425
Email: akimball@grsm.com

Erica Kelly Curren
PA I.D. No. 318819
Email: ecurren@grsm.com

**GORDON & REES LLP**
707 Grant Street
Suite 3800
Pittsburgh, PA 15219
Phone: (412) 577-7400

*Counsel for Defendant,*
*Comprehensive Healthcare Management*
*Services, LLC d/b/a Brighton*
*Rehabilitation and Wellness Center*

## CERTIFICATE OF SERVICE

I, Andrew G. Kimball, hereby certify that on August 12, 2020, a copy of the foregoing Notice of Removal was served, via FedEx overnight, postage prepaid, upon the following counsel of record:

|  |  |
|---|---|
| Robert J. Mongeluzzi, Esq.<br>David L. Kwass, Esq.<br>Elizabeth A. Bailey, Esq.<br>**SALTZ MONGELUZZI**<br>**& BENDESKY P.C.**<br>One Liberty Place<br>52nd Floor<br>1650 Market Street<br>Philadelphia, PA 19103<br>(*Counsel for Plaintiff*) | John M. Campbell, Esq.<br>**CIPRIANI & WERNER P.C.**<br>450 Sentry Parkway, Suite 200<br>Blue Bell, PA 19422<br>(*Counsel for Defendants, Healthcare Services Group, Inc., HCSG Labor Supply, LLC, HCSG Supply, Inc., HCSG Staff Leasing Solutions, LLC, Quality Business Solutions, Inc., and Brian Edward Mejia*) |

GORDON & REES LLP

By: /s/ Andrew G. Kimball, Esq.
     Andrew G. Kimball
     PA I.D. No. 46425

707 Grant Street, Suite 3800
Pittsburgh, PA 15219
Phone: (412) 577-7400
Email: akimball@grsm.com

*Counsel for Removing Defendant, Comprehensive Healthcare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness Center*
*- and -*
*Counsel for Consenting Defendants, Comprehensive Management Services – Property, LLC, CHMS Group, LLC, Sam Halper (incorrectly identified as Samuel Harper), and Ephram Lahasky*